UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MONA LEDET ET AL. | CIVIL ACTION |
| VERSUS | No. 24-2122 |
| BP PRODUCTS NORTH AMERICA ET AL. | SECTION: "J"(5) |

## ORDER AND REASONS

Before the Court are a *Motion to Remand* **(Rec. Doc. 23)** filed by Plaintiffs, Mona Ledet, Angel Ledet, and Carl Ledet, Jr., and an opposition thereto (Rec. Doc. 26) filed by Defendant Chevron U.S.A. Inc.,[1] to which Plaintiffs have replied (Rec. Doc. 36). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation arises from the death of Clay Ledet, Sr., who succumbed to lung cancer in 2023 and who had been employed from 1994–2004 by the Hydril Company in its Westwego, Louisiana pipe yard. Decedent's wife and two children filed a wrongful death and survival action in state court against various out-of-state oil companies, an in-state non-profit lobbyist (The Delta Chapter of the American Petroleum Institute), and an in-state pipe cleaning contractor (OFS, Inc.), asserting Decedent's cancer to be caused by his exposure to naturally occurring radioactive material ("NORM") at the pipe yard. Specifically, Plaintiffs allege Defendant Oil

---

[1] Other Defendant Oil Companies adopt Chevron's opposition arguments: OXY USA (Rec. Doc. 27); BP Products North America, Inc. (Rec. Doc. 29); ConocoPhillips Company (Rec. Doc. 30); and Shell Offshore Inc. and Shell USA, Inc. (Rec. Doc. 31).

1

Companies sent their used piping to the Hydril Yard to be cleaned of NORM-contaminated scaling. (Rec. Doc. 1-1 at 7 ¶ 21). From Plaintiffs' retelling, Defendant Oil Companies retained control over the shipping, storage, handling, and cleaning of their pipes, *id.* at 24 ¶¶ 157–160, but the pipes were cleaned by third-party contractors such as OFS, Inc., *id.* at 7 ¶ 26. This cleaning process, in turn, exposed Decedent to "dangerous levels of radiation" through ground contact and dust inhalation. *Id.* at 7–8 ¶¶ 25, 31. Plaintiffs further allege The Delta Chapter of the American Petroleum Institute helped develop testing protocol "with the intent that it would fail to detect the overwhelming majority of NORM contamination that was present on used oil field pipe." *Id.* at 15 ¶ 87 (emphasis omitted). Against Defendant Oil Companies and OFS, Plaintiffs assert strict liability for "a permanent, inherent and hazardous defect in said used oilfield pipe." *Id.* at 23 ¶ 154. Plaintiffs seek punitive damages under Louisiana Civil Code Article 2315.3 (effective from September 1, 1984 to April 16, 1996) from Defendant Oil Companies and compensatory damages from all Defendants.

  Defendant Chevron U.S.A. Inc. timely removed this matter pursuant to diversity jurisdiction, 28 U.S.C. § 1332. Although Plaintiffs are Louisiana citizens and name two Louisiana citizens as defendants, Chevron insists complete diversity exists due to the improper joinder of OFS and Delta. Countering those claims, Plaintiffs now move for remand, which Chevron opposes. Additionally, Defendants BP Products North America, Inc., Chevron U.S.A. Inc., ConocoPhillips Company, Marathon Oil Company, Oxy USA Inc, Shell Offshore Inc., and Shell USA, Inc. move

2

to dismiss the strict liability claims (Rec. Doc. 22), which Plaintiffs oppose (Rec. Doc. 32).

## LEGAL STANDARD

A defendant may remove a civil action filed in state court if a federal court would have had original jurisdiction over the action. *See* 28 U.S.C. § 1441(a). The district courts have original jurisdiction over cases involving citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interest or costs. 28 U.S.C. § 1332(a)(1). The removing party bears the burden of proving by a preponderance of the evidence that federal jurisdiction exists at the time of removal. *DeAguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995). Ambiguities are construed against removal and in favor of remand because removal statutes are to be strictly construed. *Manguno v. Prudential Prop. & Cas. Ins.*, 276 F.3d 720, 723 (5th Cir. 2002).

Only the citizenship of real parties in interest is relevant for diversity jurisdiction. *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980). As such, the joinder of nondiverse formal, nominal, or unnecessary parties cannot prevent removal to federal court. *Nunn v. Feltinton*, 294 F.2d 450, 453 (5th Cir. 1961). The party seeking removal bears a heavy burden of proving improper joinder. *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 574 (5th Cir. 2004) (en banc). In determining the validity of an allegation of improper joinder, the district court must construe factual allegations, resolve contested factual issues, and resolve ambiguities in the controlling state law in the plaintiff's favor. *Burden v. Gen. Dynamics Corp.*, 60 F.3d

213, 216 (5th Cir. 1995).

There are two ways to establish improper joinder: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court. *Smallwood*, 385 F.3d at 573. To establish the latter, the removing party must show there is no possibility of recovery by the plaintiff against an in-state defendant. *Id.* A mere theoretical possibility of recovery is not sufficient to preclude a finding of improper joinder. *Id.* Ordinarily, a court should resolve the issue by conducting a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. *Id.* There is no improper joinder if a plaintiff is able to survive a 12(b)(6) challenge. *Id.*

However, a court may pierce the pleadings and conduct a summary inquiry of the evidence, but "only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant." *Id.* "The district court must also take into account the 'status of discovery' and consider what opportunity the plaintiff has had to develop its claims against the non-diverse defendant." *Id.*

Where parties put forward competing motions to remand and dismiss, the jurisdictional issue takes priority. *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 209 (5th Cir. 2016) (emphasis in original) ("[A]s long as a nondiverse party remains joined, the *only* issue the court may consider is that of jurisdiction itself.").

**DISCUSSION**

I. **Motion to Remand**

Parties debate the joinder of the two non-diverse defendants in this action: OFS and Delta. The latter is more easily treatable.

### A. Improper Joinder of the Delta Chapter of the American Petroleum Institute

Plaintiffs put forward a winding set of allegations against Delta, attempting to place the organization within a broader petroleum industry conspiracy to develop testing protocol "with the intent that it would **fail to detect** the overwhelming majority of NORM contamination that was present on used oil field pipe." (Rec. Doc. 1-1 at 15 ¶ 87 (emphasis in pleading)). Based on these claims of intentional acts, the allegations sound in fraud. *See Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted) ("Courts must focus on the substance of the relief sought and the allegations pleaded, not on the label used."); *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 627 (5th Cir. 1999) ("The elements of a Louisiana delictual fraud or intentional misrepresentation cause of action are: (a) a misrepresentation of a material fact, (b) made with the intent to deceive, and (c) causing justifiable reliance with resultant injury."). Actions in fraud require a conformity with the heightened pleading standard of Federal Rule of Civil Procedure 9, wherein "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Plaintiffs, however, are steadfast that they "**do not** plead or otherwise allege a cause of action [sic] fraud herein[.]" (Rec. Doc. 1-1 at 26 ¶ 184 (emphasis in

5

pleading)). No matter the applicable pleading standard, Plaintiffs' allegations are conclusory at best, failing to pinpoint Delta's role among the asserted NORM protocol actors. In their motion to remand, Plaintiffs merely reproduce six paragraphs of their petition, insisting the selection "outlin[es] Delta API's tortious conduct." (Rec. Doc. 23-1 at 8–9). They overstate the weight of their Delta speculations. From the limited 12(b)(6)-type review, Plaintiffs fail to present a claim for a possible recovery from Delta.

This conclusion, moreover, is only bolstered from a piercing of the pleadings and the conducting of a limited summary inquiry. The affidavit of Delta President Charles Miller, III and the chapter's licensing agreement make clear the scope of the organization: "[T]o promote fellowship, communications, and improvement of member through the exchange of information on industry issues, technology, and operational experiences." (Rec. Doc. 1-4 at 6). Not only does Delta not set binding protocol for industry workers, but it's also prohibited from taking a position on industry issues: "The chapter is not authorized to adopt any resolution or take any action with respect to industry policy, or with respect to federal, state, or municipal legislation or administration or standards setting." *Id*. In sum, even if Plaintiffs had presented well-pled allegations, Delta was not in a position to perform the intentional tortious conduct claimed. The Court disregards Delta's presence for removal purposes.

### B. Factual Disputes as to the Joinder of OFS, Inc.

OFS, however, presents a closer question. Uniquely identified as the pipe

6

cleaners at the Hydril Yard, OFS allegedly took NORM-contaminated pipes and, through its cleaning process, exposed Decedent to "dangerous levels of radiation" through ground contact and dust inhalation. (Rec. Doc. 1-1 at 7–8 ¶¶ 25, 31). From these assertions, Plaintiffs make their claim pursuant to the version of Louisiana Civil Code Article 2317.1 operative at the time of Decedent's alleged exposure.

"To recover under this article a plaintiff must prove he was injured by a thing, the thing was in the defendant's custody, there was a vice or defect creating an unreasonable risk of harm in the thing, and the injured person's damage arose from such a defect." *Spott v. Otis Elevator Co.*, 601 So. 2d 1355, 1363 (La. 1992). At this remand-removal stage, parties debate the first element: whether Decedent was injured by a thing, namely, used, NORM-contaminated piping.

This inquiry cannot be resolved solely on 12(b)(6)-type evidence. Instead, parties produce dueling affidavits for their respective positions. To its notice of removal, Chevron attaches statements from Douglas M. LaNasa, Jr., the OFS president. LaNasa asserts the company has not cleaned any used pipe after 1987 and, in fact, never cleaned any pipe at the Hydril Yard. (Rec. Doc. 1-3 at 1).

In rebuttal, Plaintiffs marshal four affidavits of their own—three from OFS employees and one from a Hydril employee. All four had employment periods that overlapped with Decedent's. Significantly, all four insist OFS employees "would regularly work on used oilfield pipe at the Hydril yard, in Westwego, Louisiana" and "would remove scale deposits on the pipe . . . creat[ing] a lot of dust which would blow around the yard." (Rec. Doc. 23-2 (Claiborne Williams, III); Rec. Doc. 23-4 (Eric

7

Washington) (same); Rec. Doc. 23-3 (Robert Harris) ("They [sic] work he did there included rattling, reaming, brushing and inspecting used oil field tubulars. This work created dust clouds that were blown across the Hydril yard."); Rec. Doc. 23-5 (Glenn Willis) ("He observed OFS, Inc. employees prepare the used oilfield pipe for inspection, remove scale deposits . . . creat[ing] a lot of dust that would spread around the Hydril Westwego yard.")).

Chevron admits "Plaintiffs' counter-affidavits create a factual dispute." (Rec. Doc. 26 at 2). As factual disputes are construed in the plaintiff's favor, remand would be proper. *See Burden v. Gen. Dynamics Corp.,* 60 F.3d 213, 216 (5th Cir. 1995). However, Chevron attaches "two key documents" to its opposition, contending they disprove Plaintiffs' affidavit evidence.

The first, a Risk Evaluation/Corrective Action Program ("RECAP") assessment by a third-party consultant, reviewed two underground storage tanks Hydril desired to permanently close during the time of Decedent's employment. The tanks collected wastewater—which "consist[ed] primarily of water (typically 80–90 percent), and cutting and hydraulic fluids, aqueous coatings (phosphoric solutions), and lubricants"—and were located below the slab of Hydril's "Specialty Building," itself located next to the site's "Laydown Yard." (Rec. Doc. 26-1 at 13, 48). Chevron emphasizes the report's description of the site, particularly that there was "no reference to used oilfield pipe and no reference to NORM." (Rec. Doc. 26 at 4).

The report omits mention of used oilfield pipe, but it does not thereby establish an undisputed fact on the matter. The report's three-paragraph "land use" section

states Hydril purchased pipe goods "from specific off site manufactures as plain end materials and shipped to the subject site."[2] (Rec. Doc. 26-1 at 18). The section appears to partially rely on a previous assessment by another consultant. *Id.* at 100 ("Supplemental Report Underground Storage Tank Investigation Hydril Company"). As the 1993 report's site description began, "The Hydril Westwego facility *primarily* performs pipe threading operations to produce piping that is used primarily in drilling operations." *Id.* at 103 (emphasis added). The report does not address any secondary operations at the site.

These limited site descriptions in both reports correspond with the limited purpose for their compiling: the assessment of the permanent closure of two underground storage tanks. Their concern, therefore, is the tanks' integrity for holding the wastewater produced, for which testing was performed on the soil immediately adjacent to the tanks. *Id.* at 17. The reports do not address the use of the site beyond the specified work in the "Specialty Building." *See id.* at 48. It is

---

[2] The 2003 report describes the land use in full:

> 2.1. Previous Land Use
> In mid to late 1970, Hydril purchased the property on which the subject site is located, and constructed the facility. Prior to Hydril purchasing the property, the property was utilized for storage of used construction materials, and had not been developed.
>
> 2.2 Current Land Use
> The subject site is used by Hydril to manufacture premium thread pipe and tubular goods. The pipe and tubular goods are purchased by Hyrdil from specific off site manufactures as plain end materials and shipped to the subject site. The premium threads are cut at the subject site by permanently installed heavy industrial machinery. Water, cutting fluids and hydraulic fluids are used in the pipe threadcutting process. Upon completion of the threading operations, protective coatings consisting of water/phosphoric solutions and lubricants are applied to newly cut threads. These operations are conducted in the Specialty Building located within the northern portion of the site and east of Klein Street.

(Rec. Doc. 26-1 at 18).

9

unclear if the dust-producing, descaling work asserted by Plaintiffs' affiants could have been performed in another section of the site or would have been collected by the wastewater storage system. The "land use" section is insufficient to establish an undisputed fact.

Chevron's other key document is a 2022 "Louisiana Department of Environmental Quality Field Interview Form." The one-page form was completed after an inspection for radiation at the site, conducted in response to an "anonymous citizen complaint." (Rec. Doc. 26-2). The inspection found "no levels 2x background" and "[n]o areas of concern." *Id.* From this form, Chevron concludes Plaintiffs cannot possibly recover from OFS because NORM, which has components with "a half-life of 1600 years", would have been detected. (Rec. Doc. 26 at 5). Chevron, however, supplies no foundation for its scientific conclusion. Further, the one-page form does not indicate the Louisiana Department of Environmental Quality's investigation methods. Whether an anonymous citizen complaint would generate a NORM-reading inspection is factually uncertain.

Thus, the Court is left without clarity on whether NORM would have been detected from the inspection for radiation. This evidence, moreover, risks the Court's pretrying the case by making a determination on the presence or absence of NORM. *See B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 551 n.14 (5th Cir. 1981) ("[W]here the disputed factual issues relate to matters of substance rather than jurisdiction, e.g. did the tort occur? was there a privilege? was there a contract? etc., all doubts are to be resolved in favor of the plaintiff."). Plaintiffs plead that Decedent's injury

10

"resulted from radiation from the scale which accumulated upon the ground and in the air and from the inhalation and ingestion of the aerosolized dust." (Rec. Doc. 1-1 at 8 ¶ 31). From the submissions, the Court cannot conclude Plaintiffs have no possibility of recovery against OFS, the alleged pipe cleaners.

### C. Additional Discovery Exceeds Remand-Stage Limitations

However, Chevron requests leave to submit materials decisive on the used oilfield pipe issue. "In particular, Chevron would ask that the Court allow depositions of the affiants as well as limited records requests to affiants and their employers to verify their statements." (Rec. Doc. 26 at 5 n.1).

The Fifth Circuit has instructed district courts that at this stage "the focus of the inquiry must be on the joinder, not the merits of the plaintiff's case." *Smallwood*, 385 F.3d at 573. Moving deeper into a summary inquiry, however, draws courts closer to the merits at issue. Accordingly, "[d]iscovery by the parties should not be allowed except on a tight judicial tether, sharply tailored to the question at hand, and only after a showing of its necessity." *Id.* at 574. As a non-exhaustive list of examples, the Fifth Circuit has permitted inquiry on whether "the in-state doctor defendant did not treat the plaintiff patient, the in-state pharmacist defendant did not fill a prescription for the plaintiff patient, a party's residence was not as alleged, or any other fact that easily can be disproved if not true." *Id.* at 574 n.12 (citation omitted). Here, Chevron asks the Court to include in that list whether the in-state contractor cleaned used oilfield pipe at the alleged site.

The additional discovery requested by Chevron is destined to go beyond the

11

limited inquiry here. At the remand stage, the district cannot resolve factual disputes. *See Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 816, n.10 (5th Cir. 1993). Instead, the summary inquiry can merely establish "that in actuality there are no genuine issues of material fact." *Id.* at 816.

Through its discovery proposal, Chevron seeks to disprove the statements of Plaintiffs' four affiants. This request does not merely move for the Court's "delay in ruling on the motion to remand in order to produce or discover evidence". *Badon v. R J R Nabisco Inc.*, 224 F.3d 382, 387 (5th Cir. 2000). Instead, it forecasts defense-favorable testimony on the affiants' work history, from which the Court could then conclude there to be no genuine issue of material fact as to the complete absence of the cleaning of used oilfield pipes at the Hydril Yard. The Court declines to permit Chevron to attempt those steps at this initial, jurisdictional stage, where the inquiry is limited to "the presence of discrete and undisputed facts." *Smallwood*, 385 F.3d at 573–74. Chevron has submitted summary judgment-type evidence, and yet a factual dispute remains. As the Fifth Circuit counseled, "the inability to make the requisite decision in a summary manner itself points to an inability of the removing party to carry its burden." *Id.* at 574.

The Court is not persuaded that OFS is improperly joined. Lacking complete diversity jurisdiction, the Court must remand.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' *Motion to Remand* **(Rec. Doc. 23)**

is **GRANTED**. This case is **REMANDED** to the 24th Judicial District Court for the Parish of Jefferson.

New Orleans, Louisiana, this 24th day of October, 2024.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE